THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROOSEVELT CLAY, Defendant-Appellant.

First District (1st Division)   No. 1—01—3462

Opinion filed June 21, 2004.

518

Michael J. Pelletier and Beth Herndobler, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and William J. Dennison II, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

The trial court, after a bench trial, found defendant, Roosevelt Clay, guilty of felony murder and armed robbery. On appeal defendant challenges the sufficiency of the evidence and the court's decision to admit evidence of an oral statement defendant made while in police custody. We find the evidence sufficient, but we hold that defendant's statement was not admissible. Police elicited defendant's statement after his illegal arrest by confronting him with a written statement obtained illegally from a codefendant. Because police obtained the written statement through their misconduct, the written statement cannot attenuate the connection between defendant's illegal arrest and his subsequent oral statement. We reverse and remand.

## BACKGROUND

On December 22, 1998, around 10 a.m., three men entered a currency exchange and one of the men asked for change for a dollar. After receiving the change the three men left. One of the men returned and picked up the receiver of a payphone in the exchange. Terry Madden, an employee of United Armored, carried a green bag, containing various papers and cash, from an armored truck into the exchange. The man at the payphone put down the receiver. He met Madden at the door and fired a bullet point-blank through Madden's forehead. The man took the green bag and left in a blue compact car. Madden died minutes later.

Although several employees of the exchange saw the shooting, none could remember much about the appearance of any of the men who entered the exchange. One witness said the car in which the

shooter left looked like a Maxima, while another said it was a Honda. Police found a wallet on the sidewalk near the exchange. Inside an officer found identification for Jerry Clay and a temporary permit for a Chevy van registered in the name of Theotis Coleman. Police also found in the wallet a slip of paper with a phone number bearing the legend, "C-Note." At the police station officers traced the address listed on the registration for the van. Several officers set up surveillance near that address.

Several men and some women entered and left that address while police continued surveillance. After 1 p.m. defendant, David Clay and David Cook left that address and drove off in a Cutlass. Officers stopped the car nearby and placed all three men under arrest. They also arrested Jerry Clay after he left the same address.

A detective read defendant his rights at the police station. After a lineup an officer told defendant that a witness said defendant and Cook had been in the exchange before the murder. Defendant said he had not been anywhere near the murder scene, and he provided an alibi. By the time of trial the prosecution abandoned the identification police told defendant they received. According to the prosecution's theory, defendant did not set foot inside the exchange, and David Cook had nothing to do with the crime. The prosecution admitted that no witness positively identified either Cook or defendant in the lineup.

After 9 p.m. on the day of the murder, a state trooper found a black backpack on an expressway ramp. Inside the backpack he found a green bag and some papers belonging to the currency exchange where the murder occurred. He also found a letter addressed to Veronica Clay. An expert later found Jerry's fingerprints on the letter and fingerprints of Tony Williams on the documents.

Police found the door to Veronica's apartment ajar. When their knock elicited no answer they entered. They found Madden's keys inside. They spotted a blue Honda parked near the building. An officer contacted the registered owner of the vehicle, who told the officer she sold the car to defendant, and she intended to send him the title once he completed the promised payments for the car.

Fifteen hours after the murder and eleven hours after the arrests, Jerry admitted his involvement in the robbery. He named Tony Williams as the murderer and defendant as the getaway car driver. Defendant continued to deny any involvement, and he denied owning a blue Honda. Police then searched Jerry and defendant. Defendant had $8,100 in cash sewn into the lining of his jacket and a bill of sale for the blue Honda police found near Veronica's apartment, along with a passport, an old ad for a car, and a phone number on a piece of paper labeled "C-Note." Defendant said the cash was his, but he could not

explain where it came from. Jerry had more than $2,000 in cash and a set of keys to Veronica's apartment.

Around 11 a.m. on December 24, 1998, an attorney for Jerry came to the station. Police permitted the attorney to speak with defendant as well as Jerry. The attorney told police not to question Jerry in the attorney's absence. Jerry also asserted that he did not want to discuss the case with police unless his attorney accompanied him.

Shortly after 7 p.m. on December 24, 1998, Jerry signed a statement that an assistant State's Attorney hand-wrote. When an officer told defendant about the signed statement, defendant asked to see it. As he read over the statement, defendant said, "that's exactly what he said." A detective asked defendant what he meant. Defendant pointed to part of the statement about a discussion between Jerry and Williams in the car after the murder. Defendant asked for some time to think about whether to discuss the matter with police any further. Later defendant asked an officer about the possibility of immunity if he told police what he knew.

Police arrested Williams on February 1, 1999. Williams admitted his involvement in the robbery, and he, too, named defendant as the driver of the getaway car.

Williams, Jerry and defendant agreed to simultaneous trials. One jury decided the case against Williams and a separate jury decided Jerry's case, while defendant opted for a bench trial.

Before trial defendant moved to quash his arrest and suppress his statements and the papers and money taken from him at the police station. The trial court held that police arrested defendant without probable cause and set the matter for a hearing on attenuation.

Jerry also moved to quash his arrest and suppress his statements. The court found the arrest proper and separately considered evidence concerning the voluntariness of his statements. Police officers testified that they repeatedly reminded Jerry of his rights before he told them about his participation in the robbery. Officers gave Jerry food and allowed him to sleep, and according to the officer, no officer struck Jerry or used any physical force against him. Shortly after Jerry's attorney left the police station, Jerry knocked on the door of the interview room and asked to speak further with the officers, without his attorney. A few hours later the assistant State's Attorney hand-wrote the statement Jerry signed. Police then confronted defendant with the signed statement.

Jerry's attorney testified that when he spoke to Jerry at the station Jerry told him he did not wish to speak further to police without the attorney. The attorney next saw Jerry a few days after Jerry signed the written confession. Jerry explained that after the attorney left,

two officers used physical force to convince Jerry that he should knock on the door of the interview room and ask to speak to them further. The attorney presented a picture he took of a bruise the police work left on Jerry. The attorney elaborated that Jerry looked "like he had gone maybe a minute and a half of a round with someone."

During argument on the motion, the court twice asked the prosecution why Jerry had knocked on the door of the interview room to resume questioning. The court noted that according to the prosecution, Jerry merely repeated the story he had already told orally when he agreed to sign the handwritten statement. The court asked, "What would compel him then to want to tell it to them the same way all over again?" The prosecution suggested possible motives and added that Jerry, who did not testify, could best answer the question.

The court did not suppress the oral statements Jerry made before his attorney came to the police station, but the court disallowed the handwritten statement signed a few hours after the attorney left the station. The court said, "based on the evidence presented as to what proceeded thereafter, [Jerry's] motion to suppress statements is granted in part. That being the part of everything after [his attorney] was present."

Although the court suppressed the handwritten statement, the court found that the statement Jerry signed, along with other circumstances, served to attenuate the connection between defendant's illegal arrest and the statements defendant made in response to reading Jerry's signed statement. The court said:

> "There was no flagrant misconduct to arrest of the defendant. *** [Police] did not *** [have] probable cause, but that in and of itself does not mean they acted in a flagrantly improper way.
> ***
> The Court finds also that the intervening events as indicated are sufficient to [purge the] taint *** of the illegal arrest *** [because police subsequently developed] probable cause based on the investigation and the facts."

The court also allowed into evidence the cash found in defendant's clothing and papers found in his pocket, along with the exculpatory statements he made before he saw Jerry's signed statement.

At trial Veronica testified that she stayed at her mother's home from December 17 through December 23, 1998, because she could not find her keys to her apartment. She had last seen them during a visit at her mother's home, shortly before defendant and Jerry came to the home.

Although investigators retrieved fingerprints from much of the evidence, they found no evidence of defendant's prints on any of the

evidence. An investigation of defendant's blue Honda showed that Jerry had been in the car at some time.

The wife of Jerry's brother testified that she met defendant as part of her husband's family. A little before noon on December 22, 1998, less than two hours after the murder, she drove to Veronica's apartment for an unscheduled visit. Jerry answered the door and told her Veronica was not there. Jerry and defendant asked for a ride to the home of Jerry's mother. Jerry's mother lived at the address under police surveillance because of the van registration found with Jerry's identification on the street outside the currency exchange.

The court held:

"[T]here is no question based on the totality of the evidence that the car that was used in this offense was in fact the defendant's car.

*** The car after the occurrence was recovered by the police a short time thereafter at Veronica Clay's house. At that time the rear license plate had been removed and the defendant, the codefendant, Jerry Clay, left Veronica's apartment [together] *** and at that point defendant left his car for no apparent reason at Veronica's.

After his arrest defendant was found in possession of a passport, C-Note's telephone number, and also an advertisement for a sports utility vehicle. More importantly at the time of his arrest the police discovered sewn and hidden within his jacket $8100. The money was all in $20 bills. ***

Clearly the $8100, it is reasonable to infer, is part of the proceeds of this armed robbery.

\* \* \*

His possession of the proceeds plus the fact that they were sewn and hidden clearly [supports] a reasonable inference this is his share of the proceeds.

\*\*\*

The defendant spoke to various police officers and to the Assistant State's Attorney and in total his statement, his lies, his omissions, and his statements, especially acknowledgment of his presence even at the scene, when he was shown the [written statement signed by] codefendant all amounts to overwhelming evidence of his guilt."

The court found defendant guilty of armed robbery and felony murder, and sentenced defendant to concurrent terms of 30 years on the two charges.

## ANALYSIS

On appeal defendant argues that the court should not have permit-

ted the prosecution to introduce evidence of statements defendant made after two days in police custody, and the court should have suppressed the documents and cash found in defendant's jacket. Defendant does not contest the admission into evidence of the exculpatory statements he made before police showed him the statement Jerry signed.

The trial court found that police arrested defendant without probable cause, but subsequent events sufficiently attenuated the effect of the illegal police conduct. We will not disturb the trial court's findings of fact on a motion to suppress unless those findings are clearly erroneous. *People v. Simac*, 321 Ill. App. 3d 1001, 1003 (2001). But on questions of law we review the trial court's decision *de novo*. *Simac*, 321 Ill. App. 3d at 1003.

■ To determine attenuation our courts examine at least four factors:

"(1) the proximity in time between the arrest and the confession, (2) the presence of intervening circumstances, (3) the purpose and flagrancy of the police misconduct, and (4) whether *Miranda* warnings were given." *People v. Foskey*, 136 Ill. 2d 66, 85-86 (1990).

Courts have especially emphasized the importance of intervening circumstances and police misconduct. *People v. Willis*, 344 Ill. App. 3d 868, 884-85 (2003). The prosecution bears the burden of demonstrating attenuation. *People v. Jennings*, 296 Ill. App. 3d 761, 764 (1998).

Here the trial court accepted the testimony of officers that they repeatedly reminded defendant of his constitutional rights. More than two full days elapsed between defendant's illegal arrest and the first statement to which defendant now objects. The great temporal distance is an ambiguous factor here, particularly because police lacked probable cause to arrest for much of the time defendant remained in custody. See *People v. White*, 117 Ill. 2d 194, 223-24 (1987). The trial court emphasized that many significant events intervened between the arrest and the statement. Most notably defendant made this statement in direct response to the handwritten statement Jerry signed, and his further requests for negotiation derived from the initial statement elicited in response to the handwritten statement.

The court, on Jerry's motion to suppress the handwritten statement, found the testimony of Jerry's attorney credible. The attorney said he and Jerry both told officers Jerry did not wish to speak with police any further without his attorney present. Shortly after the attorney left, Jerry spoke to the officers again and signed a statement reiterating the facts he had already told police orally. Jerry explained to his attorney that he did so because of the pain the officers inflicted, and he showed the attorney the bruise the officers left. Jerry appeared

to the attorney as though "he had gone maybe a minute and a half of a round with someone." The attorney presented in court a photograph of the bruise he saw and he testified that he had not seen that bruise when he first saw Jerry in the police station.

While the trial court did not expressly find that police inflicted pain to obtain Jerry's signature on the handwritten statement, the court suppressed that statement "based on the evidence as to what proceeded" after the attorney left the police station. The court apparently discredited the officers' testimony that Jerry of his own free will knocked on the door of the interview room and asked to repeat the account he had already given.

When police confront a defendant in custody with evidence police obtained legally, the evidence may attenuate the connection between an illegal arrest and the defendant's subsequent statements. *People v. Wright*, 294 Ill. App. 3d 606, 613 (1998). But the prosecution cannot use evidence illegally obtained to prove attenuation between an illegal arrest and subsequent statements of the person arrested. *People v. Austin*, 293 Ill. App. 3d 784, 789-91 (1997); *People v. Beamon*, 255 Ill. App. 3d 63, 70 (1993). If police obtain statements by confronting a defendant with evidence legally obtained together with illegally obtained evidence, the court must suppress the statements unless the prosecution proves that the illegally obtained evidence did not influence the content of the statements or the defendant's decision to make the statements. *People v. Bates*, 267 Ill. App. 3d 503, 506-07 (1994).

The prosecution asks us not to follow *Austin, Beamon* and *Bates* because, according to the prosecution, the decisions conflict with *People v. James*, 118 Ill. 2d 214 (1987). In *James* our supreme court held that a statement obtained as fruit of an illegal arrest of another person provided probable cause for the arrest of the defendant. The defendant could not challenge the legality of another person's arrest as a basis for his motion to quash his own arrest.

The court in *Austin* and *Beamon* distinguished *James* because the court in *James* decided only whether police had probable cause, not whether a statement had been sufficiently attenuated from an illegal arrest. *Austin*, 293 Ill. App. 3d at 789. We too see no inconsistency between *James* and *Austin, Beamon* and *Bates*.

The rule applied in *Austin, Bates* and *Beamon* serves the purposes of the exclusionary rule and attenuation analysis. Courts require exclusion of evidence illegally seized "to deter similar police misconduct in the future *** [and to protect] the integrity of the courts." *Dunaway v. New York*, 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259 (1979). But courts permit the prosecution to present evidence

obtained following an illegal arrest if the connection between the arrest and the evidence is attenuated, because exclusion of such evidence does little to deter the constitutional violations so tenuously connected to the evidence, and the detrimental effect of exclusion on the prosecution of crimes outweighs the slight benefit from the deterrent effect. *New York v. Harris*, 495 U.S. 14, 20-21, 109 L. Ed. 2d 13, 21-22, 110 S. Ct. 1640, 1644 (1990). As the court noted in *Austin*, 293 Ill. App. 3d at 791, permitting evidence illegally obtained to attenuate the connection between an illegal arrest and subsequent statements would provide police with a significant incentive for misconduct and violations of the constitutional rights of citizens. *James* does not require such an evisceration of the exclusionary rule.

The trial court suppressed the handwritten statement Jerry signed as the product of police misconduct that occurred after Jerry's attorney left the police station. Following *Austin* and *Beamon*, we find that the prosecution cannot use the handwritten statement as an intervening circumstance attenuating the connection between defendant's illegal arrest and his statements. The prosecution showed that a number of different events, including the presentation of the handwritten statement, intervened between the arrest and the statement. But defendant made his most nearly inculpatory statement in direct response to the handwritten statement. Because the illegally obtained evidence influenced the statement defendant made, the prosecution cannot show attenuation of the statement from police misconduct. See *Bates*, 267 Ill. App. 3d at 506-07. Defendant's subsequent statements derived from his initial response to Jerry's signed statement. See *People v. Reed*, 123 Ill. App. 3d 52, 59-60 (1984). Intervening circumstances do not justify the admission into evidence of the statements at issue.

We also consider the purpose and flagrancy of police misconduct. The trial court expressly found that misconduct during the illegal arrest was not flagrant. But police act with an improper purpose when they arrest persons as part of an expedition in the hope of developing probable cause. *People v. Townes*, 91 Ill. 2d 32, 37-38 (1982).

The arrests of David Cook and David Clay, which occurred with defendant's arrest, particularly suggest that police arrested defendant on a fishing expedition for evidence. Police found a wallet near the crime scene and that wallet contained a temporary permit for a van. No witness had noticed a van near the murder scene, and two witnesses asserted that the murderer fled in a compact car. No witness saw the murderer drop the wallet or any other object. Thus, the tie between the van and the murder was extremely tenuous. Nonetheless, police set up surveillance outside the address on the van's registra-

tion. The officers explained that they arrested any person who left that address who fit the description witnesses gave of any of the men involved in the robbery. While witnesses gave extremely vague descriptions of the height and weight of two of the men, they described another participant only as a black man. Police apparently arrested any black man they saw at the address listed on the van's registration. The pattern of arrests shows that police arrested persons on an expedition in the hope of later obtaining probable cause for arrest. Illinois courts have consistently disapproved such an improper purpose for the use of police power to arrest. See *People v. Franklin*, 115 Ill. 2d 328, 335 (1987).

Jerry's handwritten statement suggests more flagrant misconduct. Shortly after Jerry's attorney spoke with police and he and Jerry both asserted Jerry's right to discontinue questioning, Jerry signed a handwritten statement repeating the account Jerry had already given police. The trial court did not expressly find flagrant misconduct in the actions police took to obtain the statement, but the court found Jerry's attorney credible and suppressed the statement based on the evidence of police acts that took place after the attorney left the station. That evidence included the attorney's description of Jerry as looking like he had gone "maybe a minute and a half" of a boxing round, along with a photograph showing Jerry's bruises. The use of physical force to obtain a confession, as suggested by the evidence here, constitutes extremely flagrant misconduct. The purpose and flagrancy of police misconduct used to obtain defendant's statement further warrant suppression of the statements.

■ The facts as the trial court found them demonstrate that intervening circumstances do not attenuate the connection between police misconduct and defendant's statements, and the misconduct for an improper purpose demands a finding of no attenuation. The trial court erred by admitting defendant's statements into evidence. Because the trial court explicitly relied on the statements as grounds for the convictions, the error prejudiced defendant. Therefore we reverse the conviction.

Defendant argues that we should not remand for retrial because the prosecution did not present sufficient evidence to support the conviction. In determining whether to remand the case, this court must consider all of the evidence presented at the trial, even if the court erred by admitting some of the evidence. *People v. Avery*, 180 Ill. App. 3d 146, 157 (1989).

Here the evidence admitted at trial showed that Veronica lost the keys to her apartment on December 17, 1998, when she went to her mother's home. Her brother Jerry and her cousin, defendant, both

came to her mother's home the same day, and on December 22, 1998, Jerry had Veronica's keys. The evidence supports the inference that Jerry took his sister's keys and had them from December 17 through December 22.

The owner of a blue Honda sold her car to defendant. On the day of the murder police found that car on the street near Veronica's apartment.

On December 22, 1998, three men went into a currency exchange. One shot Madden and took a bag of money and documents. He got into a waiting blue compact car that one witness described as a Honda. Police found Jerry's wallet on the sidewalk outside the exchange.

Later the same evening police found a backpack that contained the bag and documents from the currency exchange, along with a letter addressed to Veronica. An examiner found Jerry's fingerprints on the envelope and fingerprints of Tony Williams on currency exchange documents. Inside Veronica's apartment police found Madden's keys. The evidence leads to the conclusion that a participant in the robbery had access to Veronica's apartment on December 22, 1998. A relative saw defendant with Jerry in that apartment about two hours after the murder. Jerry's access to the apartment and the proximity of the letter he touched to the currency exchange documents support the inference that he participated in the robbery, and Williams' prints indicated he participated also. Defendant had $8,100 sewn into the lining of the jacket he wore when police arrested him. The concealment of the unexplained sum supports the inference that he obtained the money from the robbery. See *People v. Parker*, 220 A.D.2d 815, 815-16, 632 N.Y.S.2d 288, 289-90 (1995).

When police confronted defendant with a statement Jerry signed, defendant read the statement and said, "that's exactly what he said." On further questioning defendant clarified that Williams made the statement Jerry attributed to him in the car after the murder. Defendant later asked police about the possibility of immunity if defendant agreed to tell them what he knew about the murder. The evidence supports the inference that defendant drove Jerry and Williams from the murder scene in his blue Honda, and he heard them talk about the murder.

Thus, the evidence permits the inference that defendant drove Jerry and Williams from the murder scene and accepted $8,100 of the proceeds of the robbery. He stayed with Jerry for some hours afterward. In *People v. Dennis*, 181 Ill. 2d 87 (1998), the prosecution presented evidence that the defendant drove a man from the scene where the passenger committed an armed robbery. The prosecution presented no direct evidence of a prior agreement or plan to commit

the robbery. No evidence showed that the defendant knew beforehand what the robber intended, or even that he was armed. While our supreme court found an error in the instructions, the court summarily concluded:

> "As there is sufficient evidence upon which a jury may base a conviction for armed robbery, upon retrial, defendant will not be subjected to double jeopardy." *Dennis*, 181 Ill. 2d at 110.

We find the evidence here comparable. As in *Dennis*, defendant here drove the getaway car, failed to report the offense, and accepted proceeds from the offense. Moreover, defendant here remained with one of the robbers for some hours after the offense. See *People v. Rodriguez*, 254 Ill. App. 3d 921, 928 (1993). We find the evidence admitted at trial sufficient to support the convictions.

On remand the trial court will need to address defendant's argument that the court should suppress evidence of the papers and money taken from him at the police station. Because the taking followed the illegal arrest, the prosecution must prove that police obtained this evidence in a manner untainted by their misconduct. In proceedings before the first trial, neither party focused much attention on admissibility of the documents and cash, as both argued primarily about attenuation for defendant's statements. For the documents and cash, the prosecution relied primarily on Jerry's oral confession as the intervening circumstance justifying seizure of the documents and cash.

In a separate opinion we reversed Jerry's conviction and remanded for a determination of whether sufficient intervening circumstances permitted the court to admit Jerry's oral confession into evidence despite his illegal arrest. *People v. Clay*, 349 Ill. App. 3d 24 (2004). If not, Jerry's confession remains the product of police misconduct, so it cannot provide the necessary attenuation of the connection between defendant's illegal arrest and the seizure of documents and cash from him. On remand the trial court should take into account the result of the attenuation hearing concerning Jerry's statements. The parties will then have an opportunity to develop the record more fully for the determination of whether the documents and cash seized here must be suppressed.

Because police obtained Jerry's signature on the handwritten statement through their misconduct, that statement cannot attenuate the connection between defendant's illegal arrest and his statements. Defendant made the first of his statements in direct response to the handwritten statement illegally obtained, and his other statements resulted from the initial statement. Considering all the appropriate attenuation factors, we hold that the trial court erred by allowing the

statements into evidence. The trial court's explicit reliance on the statements as proof of defendant's guilt shows the error prejudiced defendant. Thus, we reverse the convictions. As we find the evidence sufficient to sustain the convictions, we remand for retrial. Before retrial the court should hold a new attenuation hearing concerning the documents and cash, and at that hearing the court should take into account the result of the attenuation hearing held in the case against Jerry.

Reversed and remanded.

GORDON and McBRIDE, JJ., concur.