FOURTH DIVISION
December 17, 2009

No. 1-08-2832

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 00 CR 9446 |
| | ) | |
| PAUL SALGADO, | ) | Honorable |
| | ) | Dennis Dernbach, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

We are asked to decide whether incrimination statements made by defendant following an illegal arrest are sufficiently attenuated from the illegality of the arrest to render the statements admissible. Following a bench trial, Paul Salgado was convicted of the first degree murder of Julio Rodarte. He was sentenced to 30 years' imprisonment for first degree murder with a 25-year enhancement for causing death with the use of a firearm. Defendant appealed. *People v. Salgado*, No. 1-03-1753 (2006) (unpublished order under Supreme Court Rule 23) (*Salgado I*). We vacated the convictions and sentences on appeal after finding that the police lacked probable cause to arrest defendant. *Salgado I*, slip op. at 52. We remanded the case to the trial court to hold an attenuation hearing. *Salgado I*, slip op. at 52. On remand, the trial court held defendant's incriminating statements made after arrest were admissible despite the illegal arrest

and reinstated defendant's conviction and sentences.

The facts related to the instant case are contained in *Salgado I* and will be repeated as necessary to resolve defendant's arguments in this appeal. Defendant, the victim Julio Rodarte, and Francisco Navarro were members of the Two-Six street gang. While driving around on January 28, 2000, sharing drugs and alcohol, defendant told Navarro, the driver, to pull into an alley. Defendant got out of the car, told Rodarte to get out of the car, and proceeded to shoot Rodarte several times. Defendant then got back into Navarro's car and told him to drive. Defendant told Navarro that if anyone asked about what happened, Navarro should say that they dropped Rodarte off before he was shot.

On February 3, 2000, between 9 p.m. and 10 p.m., defendant was brought to the police station. Defendant confessed a total of three times. On February 5, 2000, defendant confessed to Detectives Zalatoris and Lewis around 9 a.m., to Detective Lewis and Assistant State's Attorney Dan Tiernan around 5 p.m., and on videotape around 8 p.m. At issue is whether defendant's inculpatory statements, including the videotaped confession, were properly admitted at trial. Specifically, in remanding this case to the circuit court for an attenuation hearing, we directed the court to determine whether defendant's confession was sufficiently attenuated from his illegal arrest to render it admissible. *Salgado I*, slip op. at 52. During the attenuation hearing conducted by the circuit court the following facts were developed.

Detective John Zalatoris testified that, on January 29, 2000, he responded to the scene of Julio Rodarte's murder. Physical evidence suggested that Rodarte had been shot with a revolver because no shell casings were recovered. Rodarte's sister told Zalatoris that Alexander Garza

might be involved in the murder. Zalatoris spoke to Garza, who told Zalatoris that he saw Rodarte with Paul Salgado and Francisco Navarro around 10:30 p.m. on the evening of Rodarte's murder. Garza also disclosed that the Two-Six street gang to which he, Rodarte, Salgado and Navarro belonged used several guns, including a black revolver.

Detective Zalatoris went to Navarro's home between 9 and 9:30 p.m. on February 3, 2000. Zalatoris did not have an arrest warrant for Navarro, and Navarro was not handcuffed when he went to the Area One police station. Detective Zalatoris then went to defendant's home and defendant went with him to the police station.

Zalatoris spoke to Navarro at the police station in an interview room after advising him of his *Miranda* rights. Navarro indicated he understood his rights and waived them, but did not sign a written waiver. Zalatoris did not tell Navarro he was free to leave and Navarro did not ask to leave. Navarro testified that he asked for a lawyer, but Zalatoris testified that Navarro never made such a request. Initially, Navarro told the police he did not know who killed Rodarte. But, then Navarro indicated that he feared for his and his family's safety if he told the police what he knew. At approximately 2 a.m. on February 4, 2000, Navarro told the police that he saw defendant shoot Rodarte.

Shortly after arriving at the police station on February 3, 2000, Detective Zalatoris interviewed defendant after informing him of his *Miranda* rights. Defendant denied any involvement in the murder. Despite this exculpatory statement, defendant remained in the interview room. At midnight, Zalatoris went home, and he returned to work around 8:30 a.m. Upon returning to work, Zalatoris was informed by another detective that at 2 a.m., Navarro told

the police that he saw defendant shoot Rodarte. At 9 a.m. on February 4, 2000, Zalatoris officially arrested Salgado for the murder of Rodarte.

Between 9 a.m. and 10 a.m. on February 4, 2000, defendant's attorney arrived at the police station and spoke with defendant. Defendant told his attorney that he had not made any statements and had not been placed in a lineup. Defendant's attorney told defendant that he was charged with first degree murder based upon a statement given by Navarro. His attorney told Zalatoris that defendant did not want to talk to the police, left his business card and left the police station. Zalatoris continued his investigation and completed his February 4 shift without speaking to defendant again. Defendant remained in the interview room.

On February 5, 2000, around 9 a.m., Zalatoris checked on defendant. Defendant asked Zalatoris if he could speak with him. Zalatoris reminded defendant that he had a lawyer and did not have to speak with him. Defendant told Zalatoris that he wanted to tell him about "what went down." Zalatoris informed defendant of his *Miranda* rights and reiterated that he could have his attorney present. Detective Lewis was also present and testified that he heard Zalatoris give defendant his *Miranda* rights. Defendant then confessed to Rodarte's murder and later showed Zalatoris where he discarded the murder weapon. Defendant thanked Zalatoris for "being [a] friend." At approximately 7:55 p.m. on February 5, 2000, defendant signed a waiver giving up his rights to an attorney and gave a videotaped confession to the murder of Julio Rodarte in the presence of the detectives and an assistant State's Attorney.

After conducting the attenuation hearing, the circuit court found that defendant's statements were sufficiently attenuated from his illegal arrest rendering them admissible under

4

the totality of the circumstances. The court found that Navarro was not in custody, was always treated as a witness and was not under arrest. The court concluded that Navarro's statement given at approximately 2 a.m. on February 4, 2000, provided probable cause to arrest defendant and thereby served as an attenuating factor. The court reinstated defendant's conviction and sentence.

Defendant appeals from this judgement of the circuit court. On appeal, defendant contends that the circuit court erred in denying his motion to quash arrest and suppress statements because: (1) the State failed to prove by clear and convincing evidence that defendant's statements were attenuated from his illegal arrest; (2) the proffered intervening circumstances did not purge the taint associated with defendant's arrest since Navarro was also seized without probable cause; (3) the giving of *Miranda* warnings underscored the coerciveness of defendant's detention; (4) the temporal proximity factor weighs in defendant's favor; and (5) the police engaged in purposeful and flagrant conduct by detaining defendant without probable cause and exploiting the illegal detention to make a case against defendant.

## I. ATTENUATION ANALYSIS

We apply a mixed standard of review in resolving whether the trial court correctly found that defendant's incriminating statements were admissible despite his illegal arrest. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). The trial court's findings of fact will not be reversed unless they are against the manifest weight of the evidence. *Pitman*, 211 Ill. 2d at 512. However, "a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted."

*Pitman*, 211 Ill. 2d at 512. Accordingly, we review *de novo* "the ultimate question of whether the evidence should be suppressed." *Pitman*, 211 Ill. 2d at 512.

A confession given by a defendant following an illegal arrest may be admissible if it is sufficiently attenuated from any illegality. *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975). The relevant inquiry is whether the confession was obtained by exploitation of the illegal arrest or was obtained "by means sufficiently distinguishable to be purged of the primary taint" from the illegal arrest. *Wong Sun v. United States,* 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963). There are four factors to consider in an attenuation analysis: (1) whether *Miranda* warnings were given; (2) the proximity of time between defendant's arrest and statement; (3) whether there were intervening circumstances; and (4) the flagrancy of police misconduct. *People v. Klimawicze*, 352 Ill. App. 3d 13, 19 (2004), citing *Brown v. Illinois,* 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975). "Typically, intervening circumstances and flagrancy of police misconduct are the two key factors in determining whether police exploited the illegal arrest to obtain a confession. [Citations.]" *Klimawicze*, 352 Ill. App. 3d at 19. We will address each factor, however, we begin by examining the question of intervening circumstances.

A. Intervening Circumstances

Intervening circumstances sever the causal connection between the taint of an illegal arrest and an incriminating statement by the defendant. *Klimawicze*, 352 Ill. App. 3d at 20. Evidence that implicates the defendant in the crime, such as the statement of a witness or a codefendant, may provide an intervening circumstance in one of two ways. The intervening

evidence may induce the defendant to confess. *Klimawicze*, 352 Ill. App. 3d at 20. In that case, the defendant would be confronted with the newly acquired evidence before making the inculpatory statement sought to be admitted. *Klimawicze*, 352 Ill. App. 3d at 21-22. Or the new evidence may purge the taint of an illegal arrest by providing the probable cause that was previously lacking. *Klimawicze*, 352 Ill. App. 3d at 20-21.

### 1. Confronting Defendant With Navarro's Statement

"When police confront a defendant in custody with evidence police obtained legally, the evidence may attenuate the connection between an illegal arrest and the defendant's subsequent statements." *People v. Clay*, 349 Ill. App. 3d 517, 524 (2004). Defendant argues that the record reflects no evidence that defendant was in fact confronted with Navarro's statements, and accordingly, the intervening circumstance provided by Navarro's statements did not purge the taint of defendant's unlawful arrest.

We agree with the defense that the record does not reflect that defendant was confronted by the police with the information provided by Navarro. Rather, the record reflects defendant was told by his attorney between 9 a.m. and 10 a.m., on February 4, 2000, that he was being charged with first degree murder based on information Navarro gave to the police. Since the police did not confront defendant with the information provided by Navarro, the question is whether the new evidence provided by Navarro's statements purged the taint of defendant's illegal arrest by providing the probable cause that was previously lacking.

### 2. Intervening Probable Cause

In *People v. Austin*, 293 Ill. App. 3d 784, 790-91(1997), and *People v. Beamon*, 255 Ill.

App. 3d 63, 70 (1993), this court held that confronting a defendant with incriminating statements made against him by others does not serve as an intervening circumstance if those statements were made by someone who was also arrested illegally. However, an incriminating statement by a codefendant can provide intervening probable cause and "serve as an attenuating circumstance if it is legally obtained and reliable." *Klimawicze*, 352 Ill. App. 3d at 20.

The State contends that Navarro's statement was legally obtained. Defendant contends that Navarro's statement was illegally obtained and, for this reason, cannot serve as an attenuating factor. Specifically, defendant argues that "the proffered intervening circumstance – Navarro's statements – did not purge the taint associated with Salgado's arrest since Navarro, too, was seized without probable cause." In support of that argument, defendant notes that "Navarro faced nearly identical circumstances as Salgado." The defense contends that "the State has failed to refute that Navarro was seized without probable cause around midnight on February 3, 2000." Essentially, the defense argues that because we found defendant's voluntary presence at the police station became an illegal detention, we should conclude that Navarro, who faced "nearly identical circumstances," was also detained illegally.

In the instant case, it is undisputed that Navarro was transported to the police station around 9 p.m. on February 3, 2000, without a warrant. Detective Zalatoris testified that Navarro gave the statement incriminating defendant at 2 a.m. on February 4, 2000. This occurred within five hours of Navarro being transported to the police station. The State agreed that probable cause to arrest defendant did not arise until Navarro made his statement at 2 a.m. The State previously argued that defendant's voluntary encounter with the police remained voluntary

before the independent probable cause provided by Navarro at 2 a.m. on February 4, 2000. In *Salgado I*, we concluded "based on the totality of the circumstances defendant was illegally held in custody beginning at approximately midnight, 12 a.m. on February 4, 2000, at the point when he was returned to the interview room after denying involvement in the murder." *Salgado I*, slip op. at 18.

We agree with the defense that the circumstances surrounding Navarro's detention were very similar to those surrounding the detention of defendant. However, unlike defendant, who was a suspect, Navarro was a witness. Navarro, unlike defendant, was never charged with murder. Defendant initially denied any knowledge of the crime. Navarro did not deny knowledge of the crime, but rather was afraid of the Two-Six street gang and concerned for the safety of his family if he told the police what he knew. The record reflects that when police went to Navarro's home on February 3, 2000, Navarro knew about the murder. Navarro already knew that the investigation involved Rodarte's death, and he expressed concern for his and his family's safety because of the Two-Six street gang's possible involvement. Furthermore, the police knew, before going to Navarro's home, based on information provided by Alexander Garza, that defendant, Navarro and the victim were together on the night of the murder. While there is no question Navarro was reluctant to tell the police what he knew, that reluctance was generated by concern and fear. The concern, fear and reluctance reflected by Navarro is reasonable and consistent with common sense and everyday experience. Unlike Navarro, defendant was reluctant to talk to the police because he was responsible for Julio Rodarte's murder.

The reliability of Navarro's information is further supported by the independent

verification of a substantial part of his statement with facts learned through police investigation. Navarro's girlfriend, identified as "Munoz," spoke to Navarro at 3 a.m. the morning of Rodarte's murder. During the investigation, she spoke to Detective Castellanos and corroborated the information provided by Navarro. She told Castellanos that she had received a pay-phone call from Navarro, that he had told her what had happened, and that he was scared. Moreover, the information provided by Navarro was consistent with the physical evidence found at the scene of the crime. Navarro indicated that defendant used a black revolver. On January 29, 2000, or January 30, 2000, before either Navarro or defendant was brought to the police station, the police developed information regarding defendant. Alex Garza told the police that he had seen defendant and Navarro with the victim, Rodarte, on the night of his death. Garza also told the police that the Two-Six street gang used a black revolver. The .38-caliber, 9-millimeter-type round found under the body of Rodarte is consistent with having been fired by a revolver. Navarro was not handcuffed and was never told that he was not free to leave, although he testified that he did not feel free to leave. Navarro also testified that he was treated fairly.

Based on the totality of the circumstances, Navarro was not "seized without probable cause," but was a witness cooperating with the police when, at 2 a.m. on February 4, 2000, he identified Salgado as Julio Rodarte's murderer. Accordingly, we reject defendant's argument that Navarro's statement was illegally obtained.

Although Navarro's statement was legally obtained, the question remains whether it can provide attenuation since it was not obtained until after defendant had been detained illegally for a period of two hours. Navarro did not provide probable cause for defendant's arrest until 2 a.m.

10

on February 4, 2000, while defendant was still detained at the police station from 12 midnight on February 4, 2000, until the probable cause provided two hours later.

We find *People v. Morris*, 209 Ill. 2d 137 (2004), *overruled in part on other grounds*, *Pitman*, 211 Ill. 2d at 512-13, instructive. In *Morris*, as in the instant case, the probable cause for defendant's arrest was obtained shortly after defendant was detained. Similar to *Morris*, in the instant case, the police had developed other information prior to defendant's illegal arrest, but not sufficient information to establish probable cause. The court in *Morris* noted as follows:

> "Had the officers decided at this time that defendant's initial detention was illegal, they could have released him and then, based upon the probable cause that developed independently of his initial arrest, immediately arrest him again. Under this scenario, there would be no question that defendant's statements and confession would be admissible. It follows, then that the probable cause that would support a second arrest only minutes after defendant's first arrest also serves to break the causal connection between defendant's first illegal arrest and the statements defendant gave six hours later."
> *Morris*, 209 Ill. 2d at 159.

We are mindful that there was a two-hour lapse of time between the point at which defendant was illegally detained, at midnight on February 4, 2000, and when Navarro, at 2 a.m. on February 4, 2000, made a statement implicating defendant in the victim's death. However, in the factual context of this case, where the police investigation was ongoing and had revealed that defendant was with the victim on the night he was murdered, it would place an unreasonable burden on police to require release of an illegally arrested suspect and then, based on probable

cause obtained within two hours of the illegal arrest, require the police to arrest him again. See *Morris*, 209 Ill. 2d at 159, citing *People v. Berry*, 314 Ill. App. 3d 1, 17 (2000). Accordingly, the probable cause that would support a second arrest within two hours of defendant's illegal arrest serves to break the causal connection between defendant's illegal arrest and the incriminating statements defendant gave the next day. Following the defense argument, the police would have had to release defendant at midnight on February 4, 2000, and then rearrest him at 2 a.m. on February 4, 2000. Rather than releasing and rearresting defendant, the police appropriately continued the murder investigation. While continuing their investigation during that two-hour period of time, the police obtained information from Navarro that provided probable cause for defendant's arrest. The record reflects the information giving rise to probable cause was obtained independently of defendant's illegal detention and well before defendant made his first incriminating statement.

For the reasons previously discussed, we conclude Navarro's statement constitutes intervening probable cause. It was legally obtained and reliable, providing an attenuating circumstance. This factor weighs in favor of attenuation.

### B. *Miranda* Warnings

*Miranda* warnings are not sufficient to dissipate the taint of an illegal arrest, however, such warnings provide a factor to be considered in determining whether the defendant's statement was attenuated. *People v. Foskey*, 136 Ill. 2d 66, 86 (1990). In the instant case, defendant does not contest that he was warned of his *Miranda* rights before giving his oral statements and his videotaped statement. Rather, defendant argues that the repeated giving of

12

*Miranda* warnings by the police underscored the coerciveness of his detention.

The giving of *Miranda* warnings could mean either that the defendant was informed and voluntarily waived his rights, or that the repeated warnings acted as an interrogation device indicating to the defendant that the police would not cease the questioning until he confessed. *People v. Jackson*, 374 Ill. App. 3d 93, 103 (2007). In the instant case, the police gave defendant his *Miranda* rights when he was first questioned at the police station and denied involvement in the murder. The *Miranda* rights were again repeated before other discussions that took place between defendant and the police. During the 36 hours that elapsed between the time defendant left his home and gave the first inculpatory statement at 9 a.m. on February 5, 2000, defendant was not repeatedly interrogated and was not repeatedly Mirandized. Based on the totality of the circumstances, in the factual context of this case, the giving of *Miranda* warnings weighs in favor of attenuation.

## C. Flagrancy of Police Misconduct

Defendant argues the police conduct was flagrant – a "fishing expedition" – because the police "picked up and held Navarro and Salgado without warrants or probable cause in hopes they would produce evidence or statements."

"Police action is flagrant where the investigation is carried out in such a manner as to cause surprise, fear, and confusion, or where it otherwise has a 'quality of purposefulness,' *i.e.*, where the police embark upon a course of illegal conduct in the hope that some incriminating evidence (such as the very statement obtained) might be found." *People v. Jennings*, 296 Ill. App. 3d 761, 765 (1998); see also *Foskey*, 136 Ill. 2d at 86.

In *Klimawicze,* the court did not find flagrant police misconduct, noting that there was no mistreatment of the defendant, and taking into consideration the fact that the police provided food, drink and bathroom breaks for the defendant. *Klimawicze*, 352 Ill. App. 3d at 23. The defendant was in the interview room overnight, but was not repeatedly interrogated and was given sufficient time to think about her situation. *Klimawicze*, 352 Ill. App. 3d at 23.

In the instant case, by 2 a.m. on February 4, 2000, there was sufficient probable cause provided by Navarro's statement to arrest defendant. Defendant had been in the police station for five hours. At that point in time, the police were reasonable in their belief that they had sufficient probable cause to arrest defendant. While defendant was in the interview room overnight, he was not repeatedly interrogated. Moreover, the police did not engage in promises, threats, mistreatment of defendant, or act in a manner designed to create surprise, fear or confusion.

Contrary to defendant's contention, the conduct of the police did not demonstrate a quality of purposefulness. The record does not reflect that the police embarked upon a course of illegal conduct in the hope that some incriminating evidence might be found. At most, the police exercised bad judgment by failing to return defendant to his home while they continued to conduct the murder investigation. As previously noted, in this case the police would have had to return defendant to his home at midnight on February 4, 2000, and then rearrest him two hours later around 2 a.m. when Navarro told them that defendant was responsible for the murder of Julio Rodarte. In the factual context of this case, the purpose of the exclusionary rule, to deter improper police conduct, would not be served by exclusion of defendant's statements. The lack

14

of purposeful or flagrant police misconduct weighs in favor of attenuation.

### D. Temporal Proximity Between Arrest and Confession

Similar to the *Miranda* rights, the temporal proximity of the arrest and the statements is insufficient alone to purge the taint of an illegal arrest. *People v. Graham*, 214 Ill. App. 3d 798, 813 (1991), citing *People v. Lekas*, 155 Ill. App. 3d 391, 414 (1989). The prosecution notes that by the time defendant gave his first inculpatory statement at 9 a.m. on February 5, 2000, he had been at the police station for 36 hours. The prosecution argues that the 36 hours spent at the police station weigh in favor of attenuation because it is evident that defendant had time to reflect on his situation and make a voluntary statement attenuated from his illegal detention. Defendant contends that the prolonged detention reflects that the detainment prompted his confession.

The proximity in time between the defendant's illegal arrest and his inculpatory statement can be an ambiguous factor. Depending on the circumstances, a long period between arrest and confession may support different inferences as noted as follows in *People v. White*, 117 Ill. 2d 194, 223 (1987):

> "[W]here intervening circumstances are present, a long period between arrest and confession may support the inference that it was the intervening circumstance, and not the illegal arrest, which prompted the confession. However, where no intervening circumstances are present, a long and illegal detention may in itself impel the defendant to confess." *White*, 117 Ill. 2d at 223.

The defendant in *People v. Simmons* was held for 38 hours in illegal detention and argued that his statements should be suppressed because there were no intervening circumstances that

15

could purge the taint of the illegal arrest and detention. *People v. Simmons*, 372 Ill. App. 3d 735, 743-44 (2007). The court in *Simmons* noted that the lapse of time was a factor that cut both ways because the defendant was not subject to continuous interrogation during the detention, a fact which supported attenuation, but was alone in a room without knowledge of how long he would remain there, a fact which pointed against attenuation. *Simmons*, 372 Ill. App. 3d at 744. In *Simmons* the court noted this factor weighed both in favor of, and against, attenuation. However, *Simmons* concluded that the police engaged in flagrant misconduct with no intervening circumstances and reversed the trial court's finding of attenuation. *Simmons*, 372 Ill. App. 3d at 746.

In the instant case, while defendant was brought to the police station in connection with the murder on February 3, 2000, between 9 p.m. and 10 p.m., his official arrest occurred at 9 a.m. on February 4, 2000. In our previous order, based on the totality of the circumstances, we concluded the "defendant was illegally held in custody beginning at approximately midnight, 12 a.m. on February 4, 2000, at the point when he was returned to the interview room after denying involvement in the murder." *Salgado I*, slip op. at 18. However, as previously noted, within two hours, by 2 a.m. on February 4, 2000, there was probable cause to arrest defendant based on the information provided by Navarro. Defendant's attorney arrived at Area One on the morning of February 4, 2000, between 9 a.m. and 10 a.m. and spoke to defendant. After he left, Detective Zalatoris continued his investigation and completed his February 4th shift without speaking to defendant again that day.

On February 5, 2000, Zalatoris returned to work and checked on defendant around 9 a.m.

16

Defendant asked Zalatoris if he could talk to him. After being advised of his *Miranda* rights, defendant confessed to murdering Rodarte. At that point in time, defendant had been at the police station for approximately 36 hours. Later on February 5, 2000, defendant showed Zalatoris where he threw the murder weapon off the California Avenue bridge over the south branch of the Chicago River. By 5 p.m. on February 5, 2000, Assistant State's Attorney Dan Tiernan interviewed defendant. Defendant's statement in this interview was substantially similar to the statement he gave the detectives earlier that morning. At 7:55 p.m. on February 5, 2000, defendant gave a videotaped statement. This was approximately 47 hours after being brought to the police station.

The length of defendant's detention and the chronology of the various interrogation sessions indicate that defendant had adequate time to consider the situation and his decision to make the incriminating statements. The record reflects the police conducted a proper investigation and intervening circumstances provided attenuation. Although the passage of time can be considered an ambiguous factor, in the instant case, the passage of time weighs in favor of attenuation.

## II. CONCLUSION

Taking into consideration the four *Brown* factors, we conclude, based on the totality of the circumstances, that the taint of defendant's illegal arrest had been purged by the time he gave his oral confessions and videotaped statement. We find no error in the trial court's refusal to suppress the statements.

For the reasons previously discussed, the trial court properly denied defendant's motion

to quash arrest and suppress his statements. In the factual context of this case, the purpose of the exclusionary rule, to deter improper police conduct, would not be served by exclusion of defendant's statements. We, therefore, find no reason based on the totality of the circumstances to disturb the trial court's finding that the defendant's incriminating statements were sufficiently attenuated from the illegality of defendant's detention. The trial court correctly found that defendant's confession was sufficiently attenuated from his illegal arrest to render it admissible. We affirm the reinstatement of defendant's conviction and sentence.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

O'BRIEN and NEVILLE, JJ., concur.