2016 IL App (3d) 140833

Opinion filed January 26, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-14-0833 Circuit No. 12-CF-2764 |
| BRUCE GEMPEL, | ) ) ) | Honorable Robert P. Livas, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Presiding Justice O'Brien and Justice Lytton concurred in the judgment and opinion.

**OPINION**

¶ 1        The State charged the defendant, Bruce Gempel, by indictment with two counts of first

degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2012)), residential arson (720 ILCS 5/20-1

(West 2012)), and concealment of a homicidal death (720 ILCS 5/9-3.4(a) (West 2012)) in

connection with the death of his neighbor, Dorothy Dumyahn.

¶ 2        During the pretrial motion stage, the defendant moved to suppress statements he made to

police while in custody. Specifically, the defendant argued the police obtained his statements as

a product of an illegal arrest. Following a hearing, the court granted the defendant's motion to

suppress. In turn, the State requested an evidentiary hearing to establish the statements

sufficiently attenuated from the illegal arrest to allow their admission at trial. The court allowed the State's request, but after hearing the evidence and arguments, found that the State failed to meet its burden in proving attenuation. Therefore, the circuit court barred the admission of the suppressed statements at the defendant's upcoming trial. The State filed a certificate of impairment.

¶ 3                                                         FACTS

¶ 4         On the morning of November 18, 2012, an off-duty firefighter drove past the victim's home. The firefighter observed smoke coming from the home. He managed to enter through the front door, despite a chair blocking the door from the inside. Inside the home, the firefighter discovered a woman, identified later as the victim and neighbor of the defendant. It is later revealed that multiple stab wounds caused the victim's death, not the fire.

¶ 5         The police began their investigation by seeking interviews with individuals acquainted with the victim and her habits. Individuals of interest included the neighbors on each side of the home, which included Craig Gottwald and the defendant and his family. Also of interest to the police were the defendant's family's guest, Billy Norris, and the victim's regular acquaintance and friend, Rosella Hase.

¶ 6         On November 20, 2012, the defendant appeared voluntarily at the Romeoville police department for an interview with the police. The interview lasted approximately one hour. When the interview ended, the police arrested the defendant.

¶ 7         Following the arrest, the defendant remained in custody until November 22, 2012, at which time he made a recorded statement to the police. The defendant's statements in that recording are the subject of his motion to suppress and the State's later motion for an attenuation hearing. For clarity, we discuss the evidence adduced at each hearing separately.

2

¶ 8                    I. The Defendant's Motion to Suppress

¶ 9         In his motion to suppress, the defendant alleged that the police illegally arrested him without probable cause or an arrest warrant when he voluntarily appeared at the Romeoville police department on November 20, 2012. Therefore, the defendant moved to bar the admission at trial of any statements he made while in police custody, because the police obtained those statements as the product of an illegal arrest. The parties presented the following evidence, organized chronologically, at the hearing on the motion.

¶ 10                           A. November 18, 2012

¶ 11         Romeoville Police Commander Kenneth Kroll (a detective at the time of the homicide), testified that he responded to a police call-out at 2309 Caton Farm Road in Crest Hill on the morning of November 18, 2012. At the time, Kroll was a member of the Will County-Grundy County major crimes task force (task force) and had been called to investigate a homicide.

¶ 12         When Kroll arrived at the scene, he spoke with Crest Hill Police Detective Jason Opiola. Opiola told Kroll that an off-duty firefighter recovered the body of a deceased female from inside her burned home. The victim lived alone and had regular contact with her neighbors on both sides. Hase, the victim's friend, also had regular or daily contact with the victim. Opiola also told Kroll that he had spoken with the victim's daughter, who informed Opiola that the defendant borrowed money from the victim in the past. The victim's daughter had recently told the victim to stop lending money to the defendant.

¶ 13         After speaking with Opiola, Kroll viewed the scene himself. He observed the victim's body on the front lawn. He saw that the house had been very badly burned. He noted that the victim's body appeared to have significant injuries, not from the fire, but from what appeared to be stab and puncture wounds. According to Kroll, the stab wounds appeared defensive.

3

¶ 14     As Kroll viewed the scene, other investigators told him that the victim routinely blocked the front and back doors of her home with a chair after locking them. Based on their observations of the smoke trail inside the home and the absence of the chair blocking the back door, investigators believed the perpetrator knew the victim and had exited through the back door after starting the fire.

¶ 15     After viewing the scene, Kroll and members of the task force sought interviews with the victim's neighbors and friend who were present at the crime scene watching the police. This included the defendant's brother, William Gempel, the defendant's nephews, Jesse and Jacob Gempel, and the victim's friend, Hase. The Gempel family's overnight guest, Norris, was also present at the scene but was not interviewed by the task force. All individuals the task force interviewed provided voluntary buccal swab samples for testing.

¶ 16     Later that evening, William consented to a police search of his home (located next door to the victim's home).[1] Inside the residence, Kroll observed the defendant for the first time, sitting on a couch. Kroll noticed scratches on the defendant's face.

¶ 17     Detective William Sheehan, another task force member, testified that he met the defendant when police searched William's home. When he spoke with the defendant, Sheehan asked general background questions. During the conversation, the defendant mentioned that he had borrowed money from the victim in the past and it bothered the defendant when she asked for repayment. The defendant also asked Sheehan why somebody would do such a thing to the victim. Sheehan suggested that alcohol had been involved. Sheehan believed his remark made

[1]Although it is not clear from the record of the suppression hearing, the following attenuation hearing revealed William owned the home in question and the defendant stayed there.

4

the defendant upset because the defendant had previously told Sheehan that he had been drinking the night before.

¶ 18    Like Kroll, Sheehan observed a scratch on the side of the defendant's face. Sheehan also observed a scratch on the defendant's nose and some marks and scratches on both the defendant's knees. Sheehan noticed additional scratches on the inside of the defendant's right elbow. The defendant also voluntarily provided a buccal swab sample for analysis.

¶ 19    Sheehan also spoke with the victim's friend, Hase. Hase told Sheehan that William would borrow money from the victim. She indicated that the defendant would also borrow money from the victim. Hase did not tell Sheehan that the defendant owed money to the victim at the time of her death nor was Hase aware of the defendant ever threatening the victim.

¶ 20                                  B. November 19, 2012

¶ 21    According to Opiola, an autopsy was performed on the victim, during which the pathologist collected the victim's fingernails and sent the samples to the Joliet crime lab for DNA analysis.

¶ 22                                  C. November 20, 2012

¶ 23    The next day, Sergeant Sean Talbot, another task force member, interviewed the defendant's nephew, Jacob. Jacob told Talbot that it was common for the defendant to borrow money from the victim. According to Jacob, the victim knew when the defendant received his paycheck and would wait for the defendant to return from work and ask for repayment. Since the homicide, Jacob noticed that the defendant had not been sleeping, had been pacing a lot, and had called in sick to work.

¶ 24    Later in the day, the defendant appeared voluntarily at the Romeoville police department for an interview with Detectives Sheehan and Matlock. Kroll did not attend the interview but

5

was informed by the detectives that the defendant had been read and had asserted his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)). The video recording of the interview was not played for the circuit court at the suppression hearing.[2] Further, neither party offered evidence regarding the substance of the conversation between the defendant and the detectives during the interview.

¶ 25    When the interview finished, the police decided to arrest the defendant. Kroll personally escorted the defendant to the station's booking area, where Kroll took a photograph of the defendant, removed the defendant's personal belongings, and placed the defendant into a secure bullpen. When the police arrested the defendant, they had not indentified any eyewitnesses, did not have a description of the possible offender, and had not obtained a warrant to arrest the defendant.

¶ 26    By stipulation, the parties agreed that the defendant remained in custody at the Romeoville police department until November 22, 2012 (approximately 37 hours). At the end of the 37 hours, the defendant made a recorded statement to the police.[3]

¶ 27    After the parties finished presenting their evidence and arguments, the circuit court granted the defendant's motion to suppress. In so ruling, the circuit court noted that the victim's habit of placing chairs at the front and back doors of her home did not connect the defendant to the back door where the police suspected the perpetrator exited. The circuit court also noted that while the officers observed fresh scratches on the defendant, the State failed to offer any evidence connecting the defendant to the DNA under the victim's fingernails at the time of the

---

[2]The interview was played at the subsequent attenuation hearing.

[3]The record does not contain the content of those statements.

arrest. Therefore, the circuit court concluded the police lacked probable cause to arrest the defendant and suppressed the statements the defendant made to the police while in custody.

¶ 28                                II. The State's Attenuation Motion

¶ 29        Following the circuit court's ruling, the State filed a motion for an attenuation hearing. The State argued that, despite the defendant's illegal arrest, the statements should still be admissible at trial because intervening probable cause to arrest the defendant occurred two days after the arrest, when the police obtained the preliminary results from the DNA analysis of the victim's fingernails. Specifically, the State argued that this additional fact, considered along with the defendant's treatment while in custody, the absence of flagrant police misconduct, and the significant lapse of time between the illegal arrest and the statements, attenuated the statements from the illegal arrest. Thus, the State argued, the statements previously suppressed by the circuit court, should still be admissible at trial. The circuit court allowed the hearing, which adduced the following evidence.

¶ 30                                A. November 20, 2012

¶ 31        Detective Sheehan testified that on November 20, 2012 (two days after the homicide), he and Detective Matlock interviewed the defendant at the Romeoville police department around 6 p.m. Sheehan believed an officer or another individual brought the defendant to the police department for the interview. Sheehan recorded the interview, which ended around 7:10 p.m. when police arrested the defendant. Sheehan explained for the circuit court what occurred during the interview. It is unclear if the parties played the entire video recording of the interview during the hearing, but at least some of the video recording was played for the circuit court. The entire video recording is included in the record on appeal and will be described in relevant part for clarity.

¶ 32        The interrogation took place in an interview room inside the police station. The defendant sat in the corner of the room across from the exit and the two detectives sat in between the defendant and the closed door. Sheehan began the interview by reading the defendant his *Miranda* rights. The defendant initialed a *Miranda* form acknowledging he understood his rights. Sheehan then told the defendant that he was not under arrest, but did not tell the defendant that he was free to leave at any time.

¶ 33        During the interrogation, the defendant denied involvement in the homicide. The defendant admitted to borrowing money from the victim in the past, but denied owing money to the victim at the time of her death. After about 20 minutes of interrogation, the defendant told the detectives that he wanted to leave and he wanted a lawyer because he believed the detectives were "twisting this around and trying to get [him] to say something [he] didn't do."[4] Neither detective responded to the defendant's request for an attorney or told the defendant that he was free to leave. Nor did the detectives re-*Mirandize* the defendant.

¶ 34        After further interrogation, the defendant told the detectives, "again let me get a lawyer or get me out of here, I am telling you I didn't do this, I am telling you the truth[.]" After this request, the detectives acknowledged the defendant's desire to speak with an attorney and left the room. The detectives did not tell the defendant that he was free to leave but asked the defendant to remain in the room.

¶ 35        Following a six-minute break, the detectives returned to the interview room. When Sheehan sat down, he acknowledged the defendant's previous request to speak with an attorney and explained to the defendant that the request meant the detectives could not speak with the

_____

[4]Sheehan testified that he did not hear this comment during the interview itself, but after watching the video recording of the interview, he acknowledged the statement had been made.

8

defendant any further. Sheehan, however, proceeded to tell the defendant if he wanted to continue communicating with the detectives "that [would] be great." Sheehan then told the defendant that he did not really need an attorney if somebody else had committed the crime. Sheehan then stated that the detectives were prohibited from questioning the defendant further, but asked the defendant to expressly acknowledge that the defendant initiated further communication with the detectives. When the defendant asked the detectives if he was in custody, Sheehan told the defendant that he was not. Then, the defendant asked the detectives if he could smoke a cigarette. The detectives allowed the request and escorted the defendant outside to the front of the building. Outside, the defendant smoked while the detectives watched from the front door (a distance of approximately 20 feet). When the defendant finished his cigarette he returned to the detectives and walked back to the interview room.

¶ 36    Back inside, the defendant told the detectives, "I really didn't do this, I wish I would have never come today[.]" Sheehan did not tell the defendant that he could leave but asked the defendant, "do you want to talk to us without an attorney, we can just go over this real slowly[.]" The defendant asked if he was under arrest and Sheehan told the defendant that he was not. Then, the defendant told the detectives "I want to go, I'll have to get an attorney[.]" The detectives continued interrogating the defendant. Next, the defendant told the detectives, "I don't want to go to prison for something I didn't do[.]" After this, the detectives left the interview room and asked the defendant to wait in the room. After approximately 27 minutes, Sheehan returned and asked the defendant to come out into the hallway. The video recording of the interview then ended.

¶ 37    Kroll testified that the police placed the defendant under arrest after the interview concluded. Kroll personally booked the defendant. When Kroll finished booking the defendant,

9

he allowed the defendant to again go outside to smoke a cigarette. Kroll accompanied the defendant while he smoked. According to Kroll, he did not question the defendant about the case during the booking procedure or while the defendant smoked. However, while the defendant smoked, the defendant made a spontaneous statement to Kroll explaining "he was 49-years old, he couldn't believe that this was taking place and he was going to spend the rest of his life in jail." Kroll reminded the defendant that he had invoked *Miranda* and told the defendant that any conversation about the case needed to be initiated by the defendant and recorded.

¶ 38    Later in the day, Kroll accompanied the defendant outside to have another cigarette. While smoking, the defendant made another spontaneous remark, "that he wanted to sit down with the state's attorney, the police, somebody to represent him, and find out what his best case scenario was because he wanted to know that he would–he wanted to have an opportunity to see his kids again someday."

¶ 39    According to Kroll, throughout the day the defendant had been fed, allowed to use the restroom, and provided several opportunities to smoke. At the end of the day, Kroll placed the defendant in a cell, where he remained until the next morning.

¶ 40                                    B. November 21, 2012

¶ 41    In the early morning hours, the defendant's brother, William, called the police station and asked Kroll if he could speak with the defendant. Kroll notified the defendant that William had called, but the defendant chose not to speak with him at that time.

¶ 42    Later in the morning, Kroll provided the defendant coffee and a cigarette. In addition, Kroll allowed the defendant to return William's call and contact his employer. The defendant spoke with his employer about an attorney benefits program it offered. After speaking with his employer, the defendant contacted two local attorneys by phone and left messages.

10

¶ 43      Julie Glasner, assistant laboratory director for the Illinois State Police Joliet forensic science lab, supervised the analysis of the DNA samples obtained from under the victim's fingernails. According to Glasner, on November 21, she spoke with Commander Rich Demick at the Romeoville police department, who worked with Detective Opiola. She informed Demick that the preliminary results from the DNA analysis revealed the presence of female and male DNA under the victim's fingernails.

¶ 44      According to Glasner, the DNA test did not identify the individual matched to the DNA, the age or race of the DNA, how long the DNA had been under the victim's fingernails, or how the DNA got underneath the victim's fingernails.

¶ 45      In the evening, Kroll asked the defendant for consent to take hair samples to compare to the samples recovered from the victim's fingernails. Kroll read the defendant his *Miranda* rights and the defendant consented to provide hair samples. By way of stipulation, the parties agreed that while Kroll took the hair sample from the defendant, the defendant commented, "I really want to be able to talk to an attorney. I wish there was a way to do that, you know what I mean, but I have got no control over that."[5] At the time, the defendant had still not spoken with an attorney.

¶ 46      Kroll also allowed the defendant to take regular cigarette breaks throughout the day. In addition, Kroll provided the defendant with access to the restroom, meals, and a shower. Like the previous day, Kroll placed the defendant in his cell for the night. Shortly after, Kroll left the Romeo police department.

_____

[5]When asked about the statement, Kroll indicated he did not remember the defendant requesting an attorney. The video recording of the event was played in open court but was inaudible. Consequently, the parties stipulated to the statement.

11

¶ 47                                    C. November 22, 2012

¶ 48        Romeoville Police Officer Michael Michienzi, testified that he worked the booking room

at the Romeoville police department in the early morning hours of November 22, 2012.

According to Michienzi, at around 5:30 a.m., he walked past the defendant's cell and the

defendant asked Michienzi if he could speak with Kroll because "he did something wrong and

needed to talk to [Kroll]."

¶ 49        Kroll received a call from the station informing him that the defendant wished to speak.

Kroll arrived at the station around 6:45 a.m. and allowed the defendant to have coffee and a

cigarette before speaking.

¶ 50        At 7:13 a.m., the defendant followed Kroll and Detective Opiola into an interview room.

The defendant was read his *Miranda* rights.  The defendant acknowledged that he initiated the

conversation with the detectives and knew his statement would be recorded.  At that time, the

defendant made a recorded statement to the police.  The next morning the defendant was

transported to the Will County adult detention facility.  This ended evidence.

¶ 51        After hearing the parties arguments, the circuit court made the following findings:

>        "[T]he surrounding circumstances of the conduct of the defendant were so
>
>        insignificant as to not even contribute to probable cause.  The only physical piece
>
>        of evidence in the original ruling [at the suppression hearing] or circumstance was
>
>        scratch marks.
>
>            In the attenuation hearing nothing further was presented to this Court
>
>        except for the fact that unknown DNA were taken from the [victim's] fingers
>
>        coming back mostly female and some male.

The defendant did not flee during that time, he voluntarily gave DNA. The defendant was never caught in any lie that I know about. There was no other physical evidence found at all during that period of time.

And I've already made statements concerning the police, their interview on the 18th. The conclusion I'll draw is that in terms of the four elements that were required, the State fails. And it's not the State's fault, it's just the evidence and what was going on at that station. In any case, they did not meet their burden."

Therefore, the circuit court denied the State's attenuation request and motion to reconsider its ruling on the defendant's motion to suppress.

¶ 52     Following the circuit court's ruling, the State filed a motion to reconsider its attenuation ruling and a certificate of substantial impairment to proceed to trial. The certificate asked the circuit court to hold the prosecution of the case in abeyance pending the State's appeal from the attenuation ruling. The circuit court denied the motion to reconsider but granted the State's motion for impairment.

¶ 53                                         ANALYSIS

¶ 54     At the outset, we note that the State does not dispute that the detectives illegally arrested the defendant following his interview with detectives on November 20, 2012. In addition, the State does not challenge the circuit court's initial ruling on suppression. However, the State argues the suppressed statements should still be admissible at trial because the evidence presented at the suppression and attenuation hearings demonstrated that the confession was sufficiently attenuated from the illegal arrest. The State only challenges the suppression of the statements the defendant made on November 22, 2012.

13

¶ 55        An illegal arrest does not in and of itself render a defendant's statements to police inadmissible. *People v. Morris*, 209 Ill. 2d 137, 157 (2004). Statements made by a defendant following an illegal arrest may still be admissible if it is sufficiently attenuated from the illegal arrest. *People v. Salgado*, 396 Ill. App. 3d 856, 860 (2009). In making this determination, the question is whether the statements were obtained by exploitation of the illegal arrest or were obtained " ' by means sufficiently distinguishable to be purged of the primary taint ' " of the illegal arrest. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (quoting John M. Maguire, Evidence of Guilt 221 (1959)). Courts consider the four following factors in attenuation analysis: (1) the flagrancy of police misconduct; (2) whether there were intervening circumstances; (3) the proximity of time between defendant's arrest and statement; and (4) whether *Miranda* warnings were given to the defendant. *Salgado*, 396 Ill. App. 3d at 860. The State has the burden of showing that the defendant's statements were sufficiently attenuated from his illegal arrest to be admissible. *People v. Foskey*, 136 Ill. 2d 66, 86 (1990).

¶ 56        While we apply a manifestly erroneous standard to the circuit court's findings of fact, we review *de novo* the ultimate question of whether the evidence should be suppressed. *Salgado*, 396 Ill. App. 3d at 860. We consider each of the above four factors with this standard of review in mind.

¶ 57                              I. Purpose and Flagrancy of Police Conduct

¶ 58        "The presence of purposeful and flagrant police misconduct weighs against attenuation. [Citation.] 'Police action is flagrant where the investigation is carried out in such a manner as to cause surprise, fear, and confusion, or where it otherwise has a "quality of purposefulness," *i.e.*, where the police embark upon a course of illegal conduct in hope that some incriminating evidence (such as the very statement obtained) might be found.' " *People v. Klimawicze*, 352 Ill.

14

App. 3d 13, 23 (2004) (quoting *People v. Jennings*, 296 Ill. App. 3d 761, 765 (1998)). In other words, police misconduct is flagrant where "it has a quality of purposeful or intentional misconduct." *People v. Johnson*, 237 Ill. 2d 81, 94 (2010).

¶ 59        The defendant argues the police flagrantly violated his fifth amendment right to counsel during the November 20, 2012, interview with Detectives Sheehan and Matlock because they continued to interrogate him after he invoked *Miranda* and asked to leave and speak with an attorney. Because the record clearly establishes the defendant was in custody and invoked his *Miranda* rights, we agree.

¶ 60        Under *Edwards*, when an accused individual subjected to custodial interrogation requests an attorney, he is not subject to further interrogation until counsel has been made available to him, or he initiates further conversation with the authorities. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Before considering the detectives' compliance with the defendant's requests for counsel in this case, we must determine whether the defendant was in custody during the November 20, 2012, interview.

¶ 61        An individual is in custody "if, under the circumstances of the questioning, 'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Jordan*, 2011 IL App (4th) 100629, ¶ 17 (quoting *People v. Braggs*, 209 Ill. 2d 492, 506 (2003)). To determine whether a statement was made in a custodial setting, the following factors are relevant:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or

15

fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *People v. Slater*, 228 Ill. 2d 137, 150 (2008).

Another factor to consider is whether the suspect "had reason to believe that he or she was the focus of a criminal investigation." *People v. Vasquez*, 393 Ill. App. 3d 185, 190 (2009).

¶ 62    The first factor (the location, time, length, mood and mode of questioning), as applied in this case, favors finding the defendant was in custody during the interview with the police. The interrogation took place in a small interview room with the door closed. The detectives placed the defendant in the corner opposite the exit and blocked the defendant's path to the exit by placing themselves in between the defendant and the door.

¶ 63    Likewise, the second factor (the number of police officers present) weighs in favor of finding the defendant was in custody. The defendant was alone with two detectives when the interview took place. Similarly, the third factor (the absence of family and friends) favors finding the defendant was in custody, as the defendant's family and friends were absent during the interview. *Id.* (officers establish domination over a suspect by removing him from the presence of others who could offer moral support).

¶ 64    While the police did not book the defendant until after the interview, the fourth factor (any indicia of a formal arrest procedure) also favors finding the defendant was in custody. The detectives advised the defendant of his *Miranda* rights at the very beginning of the interview, the defendant asserted his innocence, and had his requests to leave repeatedly ignored by the detectives. See *People v. Ollie*, 333 Ill. App. 3d 971, 984 (2002) (a reasonable person who had been advised of his *Miranda* rights and had asserted that he knew nothing about the crime, but was not released, would not have believed he was free to leave).

16

¶ 65    The fifth factor (the manner in which the defendant arrived for questioning) also favors the same finding. The defendant did not drive himself to the interview with the police. Thus, the defendant had no reasonable means to leave the station on his own, because he lived in Crest Hill and the interrogation took place in Romeoville. The sixth factor (the age, intelligence, and mental makeup of the accused) is ambiguous.

¶ 66    The final factor (whether the defendant had reason to believe he was the focus of a criminal investigation), overwhelmingly favors the defendant. Throughout the interview the defendant denied involvement in the crime and told the detectives that he believed they were trying to get him to admit to something he did not do. Also, the defendant asked if he was under arrest or being booked several times throughout the interview. When the defendant requested a cigarette, the detectives escorted the defendant outside and watched him from a short distance. While the detectives told the defendant he was not under arrest, the surrounding circumstances made it clear the defendant was not free to leave the police station. Considering these factors together, we find the defendant was in custody from the very beginning of the November 20, 2012, interview.

¶ 67    Having concluded the defendant was in custody during the November 20 interview, we now address whether the detectives violated the defendant's fifth amendment right to counsel after he invoked *Miranda*. As noted above, when an accused individual subjected to custodial interrogation requests an attorney, he is not subject to further interrogation until counsel has been made available to him, or he initiates further conversation with the authorities. *Edwards*, 451 U.S. at 484-85. Put another way, "[l]aw enforcement authorities violate [the *Edwards*] rule if they approach the accused for further interrogation without making counsel available." *People v. Miller*, 393 Ill. App. 3d 1060, 1064 (2009).

17

¶ 68    In the present case, the defendant indisputably expressed a desire to speak to an attorney three times during the interview with Detectives Sheehan and Matlock (an interview which included approximately 37 minutes of actual questioning). The detectives completely ignored the defendant's first request for counsel and continued interrogating the defendant. The second time the defendant asked for counsel, the detectives acknowledged that they were prohibited from further communication with the defendant. Yet, Sheehan told the defendant that if he wanted to continue talking it would be "great." What is even more troubling is the fact that Sheehan told the defendant he did not really need an attorney.

¶ 69    While the defendant may have arguably reinitiated conversation by continuing to speak with the police after he asked for an attorney, we find it particularly egregious that Sheehan asked the defendant to expressly acknowledge that the defendant—not the police—initiated further communication. It is clear from a review of the videotaped interview that Sheehan was initiating the communication. This tactic exemplifies an obvious attempt on the part of the detectives to contravene the defendant's asserted rights and engage in further discussion. We cannot condone conduct such as this where the detectives clearly understood they were prohibited from initiating further communication but chose to do so anyway hoping the defendant would confess.

¶ 70    On the following day, the police again violated the defendant's fifth amendment right to counsel when Kroll took the defendant's hair sample. In doing so, Kroll ignored the defendant's comment, "I really want to be able to talk to an attorney. I wish there was a way to do that, you know what I mean, but I have got no control over that." Kroll did not respond to the defendant's request or make counsel available. Instead, Kroll went ahead and took the defendant's hair sample.

18

¶ 71      We also emphasize the fact that the detectives engaged in purposeful misconduct when they illegally arrested the defendant without probable cause or warrant.  See *Klimawicze*, 352 Ill. App. 3d at 23 (police misconduct is also flagrant where the authorities arrest a suspect without probable cause while hoping that incriminating evidence, such as a confession, might eventually turn up).  An arrest without probable cause violates the fourth amendment.  *People v. Marcella*, 2013 IL App (2d) 120585, ¶ 30.

¶ 72      Here, the State does not dispute the circuit court's finding that the defendant had been arrested without probable cause.  At the time of the arrest, the police had no direct witnesses, no physical evidence, nor any evidence tying the defendant to the crime.  Further, the defendant repeatedly denied involvement in the homicide, appeared voluntarily for the interview, complied with the detectives' requests, and did not attempt to flee the police.  At no point did the detectives attempt to obtain an arrest warrant.  In this context, we find the investigators arrested the defendant without probable cause hoping other evidence, such as a confession, might turn up after the arrest.  See *People v. Clay*, 349 Ill. App. 3d 517, 525 (2004).  This, along with the investigators' repeated disregard for the defendant's requests to leave and for counsel demonstrates a purposeful intent on the part of the police to contravene the defendant's protected rights with the intent to improperly obtain statements from the defendant.  Providing the defendant with adequate food and water, cigarettes, and access to the restroom does not cure these glaring violations.  Consequently, we conclude the police acted flagrantly.  As such, this factor weighs against attenuation.

¶ 73                                    II. Intervening Circumstances

¶ 74      Next, we consider whether intervening circumstances exist severing the causal connection between the illegal arrest and the defendant's statements on November 22, 2012.  At

19

the suppression hearing, the State argued that probable cause existed based on a totality of circumstances. At the time police arrested the defendant, they knew the defendant lived next door to the victim, the defendant's face was scratched, and the victim may have been in a struggle before her death. They also knew the defendant was the only individual interviewed by police that had scratches on parts of his body. In addition, Sheehan believed the defendant became angry when he told the defendant the crime probably involved alcohol. Further, the defendant had trouble sleeping following the victim's death, paced more often, and missed work. There was also some evidence the defendant borrowed money from the victim at some point and the defendant felt irritated when the victim asked for repayment. Therefore, the State argued that the totality of these circumstance established probable cause to arrest the defendant when he interviewed with police on November 20. As discussed above, the circuit court rejected the State's argument and concluded the defendant had been illegally arrested without probable cause. The State does not challenge the circuit court's legal conclusion or the facts contained within this paragraph.

¶ 75    Instead, in the attenuation hearing and on appeal, the State argues that an intervening circumstance occurred between the time of the illegal arrest (November 20, 2012), and the defendant's statements (November 22, 2012). Specifically, the State contends the intervening circumstance is the preliminary DNA analysis results from the victim's fingernail scrapings, which revealed the presence of unidentified female and male DNA. Thus, the State argues that this fact, considered with what police already knew at the time, established intervening probable cause to arrest the defendant. We disagree.

¶ 76    "Intervening circumstances sever the causal connection between the taint of an illegal arrest and an incriminating statement by the defendant." *Salgado*, 396 Ill. App. 3d at 861.

20

Specifically, evidence tending to show that the defendant committed the crime can be an intervening circumstance in one of two ways: (1) where a defendant is confronted with newly acquired evidence, that evidence may cause him to confess; or (2) new evidence may provide the probable cause that was previously not present. *Id*. The State concedes the police did not confront the defendant with any newly acquired evidence. Therefore, the sole question we consider is whether the preliminary DNA analysis provided intervening probable cause to arrest the defendant.

¶ 77     "Probable cause exists where the totality of circumstances and facts known to officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." *Morris*, 209 Ill. 2d at 159. The question of whether there was probable cause for an arrest is governed by common sense. *People v. Hopson*, 2012 IL App (2d) 110471, ¶ 9.

¶ 78     The preliminary results from the DNA analysis revealed the presence of unidentified male and female DNA underneath the victim's fingernails. The results did not indicate a match with the defendant. Likewise, the results did not match the victim. In fact, at that stage in the analysis, it was not possible to match the DNA to any specific individual. Further, the DNA analysis did not reveal the age or ethnicity of the individual's DNA. Nor did the analysis reveal how the DNA found its way underneath the victim's fingernails or for how long the DNA had been underneath the victim's fingernails.

¶ 79     In short, the DNA revelation added nothing to the information already known to the investigators at the time, as it did not eliminate any person on earth as a possible suspect. It makes no difference that the defendant was the only suspect observed by police with scratches on his face and body. Despite having the opportunity to do so, the investigators failed to ask the

21

defendant or anybody else when or how the defendant came to be scratched. Further, the State did not offer any evidence that the victim did in fact scratch the perpetrator when she was killed. Therefore, applying the common sense standard, we find the DNA evidence, when considered with the other evidence known to the police at the time, did not establish probable cause to arrest the defendant. Accordingly, we find no intervening circumstance and this factor weighs against attenuation.

¶ 80        III. Temporal Proximity Between the Illegal Arrest and the Defendant's Statement

¶ 81        The next factor we consider is the temporal proximity between the illegal arrest and the defendant's statement. This can be an ambiguous factor. *People v. White*, 117 Ill. 2d 194, 223 (1987). For example, where a defendant is confronted with intervening circumstances, a significant lapse of time between the illegal arrest and the defendant's statement may help to remove the taint of the arrest by allowing the defendant time to reflect on his situation. *Id.* On the other hand, where no intervening circumstances are present, like in this case, a long period of detention may exacerbate the taint of the illegal arrest by causing the suspect to confess. *Id.*

¶ 82        In present case, the defendant had been detained nearly 37 hours when he made his statements to the police. This prolonged detention may well have aggravated the taint of the defendant's illegal arrest and compelled him to make his statement. See *id.* at 224. Moreover, the significant police misconduct detailed above exacerbated the lengthy detention. See *People v. Simmons*, 372 Ill. App. 3d 735, 743-46 (2007) (finding statement had not been sufficiently attenuated from the defendant's illegal arrest when held for 38 hours, subjected to flagrant police misconduct, and had no intervening circumstances). While we acknowledge this factor may be ambiguous, we find that under the facts at hand, this factor weighs against attenuation.

¶ 83                              IV. *Miranda* Warnings

¶ 84        The final factor we consider is whether the defendant was given *Miranda* warnings.  Like temporal proximity, the giving of *Miranda* warnings can be an ambiguous factor.  For example, the giving of *Miranda* warnings may mean that a suspect voluntarily waived his right against self-incrimination.  *White*, 117 Ill. 2d at 223.  On the other hand, repeatedly giving the suspect *Miranda* warnings may act as a coercive interrogation device indicating to the suspect that questioning will not end until he has confessed.  *Salgado*, 396 Ill. App. 3d at 865.

¶ 85        In the instant case, there is no dispute police gave the defendant *Miranda* warnings on several occasions.  While this fact when viewed in an isolated context arguably weighs in the State's favor, we hold the detectives' continuous disregard for the defendant's *Miranda* rights demonstrates that the warnings were used as a coercive interrogation device to obtain statements from the defendant.  See *People v. Jackson*, 374 Ill. App. 3d 93, 103 (2007).  Therefore, we find this factor weighs against finding attenuation.

¶ 86                                   CONCLUSION

¶ 87        In sum, we find all four factors in attenuation favor the defendant.  Therefore, we conclude the State failed to meet its burden in demonstrating that the statements made by the defendant while in custody at the Romeoville police department were sufficiently attenuated from the taint of illegal arrest.  Accordingly, we hold the circuit court properly suppressed the statements.

¶ 88        In reaching this conclusion, we reject the State's argument that the defendant's statements to police on November 22, 2012, are still admissible because the "defendant clearly reinitiated contact with law enforcement in order to make his statements."  In making this argument, the State assumes that the defendant voluntarily waived *Miranda* when he asked to speak with Kroll at the end of the 37 hours in custody.  We reject this assumption and hold that the defendant did

23

not voluntarily waive *Miranda*. As discussed at length above, the police illegally held the defendant without probable cause, repeatedly ignored his requests to speak with an attorney, and held him nearly 37 hours before he made his statements. By that time, the defendant's "voluntary" waiver of *Miranda* was meaningless.

¶ 89    Even if we were to agree with the State and find that the defendant's statements were voluntarily, "[t]he fact that an illegally seized defendant ultimately received *Miranda* warnings, waived them, and voluntarily spoke to police does not automatically mean that the causal connection between the illegality and the arrest has been broken for fourth amendment purposes." *People v. Lopez*, 229 Ill. 2d 322, 355 (2008). The fifth amendment voluntariness requirement is a "threshold requirement" for fourth amendment analysis. *Brown v. Illinois*, 422 U.S. 590, 604 (1975). In other words, "if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached." *Dunaway v. New York*, 442 U.S. 200, 218 (1979). Thus, where the defendant gave a voluntary statement under the fifth amendment, we conduct attenuation analysis to determine whether police obtained the statement by exploiting an illegal arrest under the fourth amendment. *Brown*, 422 U.S. at 602. We have already found the police obtained statements from the defendant by exploiting the illegal arrest. Therefore, we reject the State's argument.

¶ 90    Moreover, to accept the State's position would substantially dilute the fourth amendment exclusionary rule. *Dunaway*, 422 U.S. at 217. Under the State's theory, " '[a]rrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings.' " *Id.* (quoting *Brown*, 422 U.S. at 602).

¶ 91	Finally, we find inapplicable the cases cited by the State to support the proposition that "[i]t is well settled that a defendant who tells police that he wants to talk to them about the investigation is the type of defendant reinitiation that purges any taint from an initial unfulfilled request for counsel." Those cases (*People v. Crotty*, 394 Ill. App. 3d 651, 661-62 (2009) and *People v. Outlaw*, 388 Ill. App. 3d 1072, 1085 (2009)) do not involve an illegal arrest or attenuation analysis. Again, in attenuation the question is not whether the State purged the taint of an unfulfilled request for counsel, but instead, whether the State purged the taint of an *illegal arrest*. *Wong Sun*, 371 U.S. at 488. We find the State has not met its burden.

¶ 92	The judgment of the circuit court of Will County is affirmed.

¶ 93	Affirmed.